**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

**UNITED STATES OF AMERICA**

       **Plaintiff,**

**v.**                                   **CASE NUMBER: 2:06 CR 63**

**VIKRAM S. BUDDHI**

       **Defendant.**

**<u>SENTENCING MEMORANDUM ON BEHALF OF VIKRAM S. BUDDHI</u>**

# TABLE OF CONTENTS

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Response to the final Presentence Investigation Report . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    USSG § 3A1.2(b) does not apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

            1.    Neither the President, Vice-President, former Secretary of Defense,
                  nor the wives of the President and Vice-President experienced the
                  kind of harm that calls for classification as a "victim" . . . . . . . . . . . . . . 2

            2.    Mr. Buddhi's offenses were not "motivated by" any person's
                  official status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    USSG § 3D1.4 does not apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Conclusion: The correct total offense level is twelve and the correct
            guidelines sentencing range is ten to sixteen months' imprisonment . . . . . . . . . 7

III.  Sentencing under *Booker*, *Rita*, *Kimbrough*, and *Gall* . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.   Application of § 3553(a) to the facts of this case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Nature and circumstances of the offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            1.    The Yahoo! Inc. finance discussion boards are known to contain
                  vulgar and crude political and social commentary . . . . . . . . . . . . . . . . . 10

            2.    The few phrases found unlawful exist in a context that suggests that,
                  taken as a whole, the posts constitute forceful political opinions and
                  exhortations expressed in vulgar and crude form . . . . . . . . . . . . . . . . . . 12

            3.    The posts were not sent or specifically addressed to those named in
                  the posts but rather were placed on public internet discussion forums
                  in the form of advocacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            4.    Mr. Buddhi complied with government agents' request that he stop
                  submitting posts with similar content . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            5.    Mr. Buddhi cooperated with agents investigating the internet posts . . . . 15

            6.    Government agents determined that Mr. Buddhi was never in fact a
                  threat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

B.      History and characteristics of Vikram S. Buddhi . . . . . . . . . . . . . . . . . . . . . . . . 16

C.      The kinds of sentences available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

D.      Mr. Buddhi's case falls far outside the "heartland" of conduct the Sentencing
Commission intends the guideline sentence to encompass . . . . . . . . . . . . . . . . . 19

          1.      Mr. Buddhi's case does not involve threats that he sent directly to the
individuals named in the communications or to others with access to
the individuals named . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          2.      Mr. Buddhi's case does not involve threats that communicate that he,
or others acting in concert with him, will carry out the acts described . . 24

          3.      Conclusion: Because Mr. Buddhi's offense conduct falls far outside
the "heartland" of conduct the guideline sentence encompasses, his
case calls for a below-guideline sentence . . . . . . . . . . . . . . . . . . . . . . . . 30

E.      Even if, pursuant to USSG § 3D1.4, technically, a five level increase in
Mr. Buddhi's total offense level applies, in the context of Mr. Buddhi's case,
a five level increase overstates the seriousness of the offenses . . . . . . . . . . . . . 31

F.      Additional circumstances support a below-guideline sentence . . . . . . . . . . . . . 34

          1.      Mr. Buddhi's extreme vulnerability to victimization in prison
and history of actual victimization in prison support a
below-guideline sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

          2.      An almost certain deportation to India supports a
below-guideline sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

V.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# I.    Introduction

Vikram S. Buddhi, through attorney John E. Martin, files this Sentencing Memorandum to assist this Court in the exercise of its discretion to determine the type and length of sentence sufficient, but not greater than necessary, to achieve the objectives of sentencing Congress set forth in 18 U.S.C. § 3553(a)(2).

Mr. Buddhi respectfully requests that the Court impose a sentence of 505 days' imprisonment, which equates to time served. A sentence of 505 days' imprisonment, as required by § 3553(a)(2), reasonably provides just punishment, adequately deters others from committing similar crimes, protects the public, promotes respect for the law, and promotes rehabilitation.

In support of his argument that a sentence of 505 days' imprisonment is the minimally sufficient sentence that achieves the objectives of sentencing, Mr. Buddhi discusses below the application of § 3553(a) to the facts of his case. Also, he attaches to this Memorandum letters and certificates that will give the Court a more complete picture of his character and life story than is possible through only legal memoranda. (*See* attached defense exhibits A-K.) Preliminarily, however, Mr. Buddhi first submits below a response to the final Presentence Investigation Report.

# II.    Response to the final Presentence Investigation Report

Mr. Buddhi objects to two sentencing enhancements applied. It was error to apply a six level enhancement under USSG § 3A1.2(b) and a five level enhancement under USSG § 3D1.4.

## A.    USSG § 3A1.2(b) does not apply

Section 3A1.2 is the "Official Victim" enhancement provision. U.S. SENTENCING GUIDELINES MANUAL § 3A1.2 (2007). A six level enhancement under § 3A1.2(b) applies if the victim of the offense "was . . . a government officer; . . . a former government officer; or . . . a

member of the immediate family of a [present or former government officer]; [and] . . . the offense of conviction was motivated by such status"; and "the applicable Chapter Two guideline is from Chapter Two, Part A." USSG §§ 3A1.2(a) and (b). The enhancement applies only "when specified individuals are victims of the offense." USSG § 3A1.2 cmt. n.1.

Here, the applicable guideline is from Chapter Two, Part A. The only issues are whether "specified individuals" are "victims" and if so, whether Mr. Buddhi's posts were "motivated by" the official statuses of the "specified individuals."

### 1. None of the "specified individuals" experienced the kind of harm that calls for classification as a "victim"

Neither the President, Vice-President, former Secretary of Defense, nor the wives of the President and Vice-President even knew about the posts at the time of the posts and so none can be said to have experienced the kind of harm that calls for classification as a "victim." None was a "victim" of the offenses.

The term "victim" is not defined for purposes of USSG § 3A1.2. Other authorities provide definitions. Black's Law Dictionary defines "victim" as "[a] person harmed by a crime, tort, or other wrong." BLACK'S LAW DICTIONARY 1598 (8th ed. 2004). Also, the Sentencing Commission describes the term "victim" for purposes of USSG § 3D1.2 as the "one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim." U.S. SENTENCING GUIDELINES MANUAL § 3D1.2 cmt. n.2 (2007).

The definitions of "victim" require that the person described as the "victim" experience direct and serious harm as a result of the offense committed. In the context of a threat, in order to experience the kind of harm that calls for classification as a "victim," a person described as a "victim" must know of the threat at the time of the threat and react to the threat in some way.

In Mr. Buddhi's case, no evidence exists that any of the individuals specified in the posts knew of Mr. Buddhi's posts before any perceived threat had passed such that any of them was "harmed by" or "directly and most seriously affected by" the posts. The reason why neither the President, Vice-President, former Secretary of Defense, nor the wives of the President and Vice-President experienced the kind of harm that calls for classification as a "victim" is that Mr. Buddhi neither addressed his posts to any of them nor made an attempt to communicate his posts to any of them; rather, he addressed the posts to "IRAQIS" and he submitted the posts on public discussion forums. He did not specifically intend that any of them receive notice of the posts.

In a case like Mr. Buddhi's, where none of the individuals specified in the posts knew of the posts before any perceived threat had passed, none suffered the kind of harm that calls for classification as a "victim." Because none was a "victim," none could be classified as an "official victim." Section 3A1.2 therefore does not apply.

## 2. The offenses were not "motivated by" any person's official status

The references in Mr. Buddhi's posts to "GW BUSH," "DICK CHENEY," "DONALD RUMSFELD," "LAURA BUSH," and "LYNNE CHENEY" were motivated by Mr. Buddhi's perception of their statuses as Anglosaxons. The content of the posts reveals that their official statuses were not the motivating force behind the posts.

Under USSG § 3A1.2(b), in order for the six level enhancement to apply, the government must establish that Mr. Buddhi's offenses were "motivated by" the statuses of "GW BUSH," "DICK CHENEY," "DONALD RUMSFELD," "LAURA BUSH," and "LYNNE CHENEY," as President, Vice-President, Secretary of Defense, and the wives of the President and Vice-President. In this case, the enhancement does not apply.

3

The posts never mention the fact that "GW BUSH," "DICK CHENEY," or "DONALD RUMSFELD" held at any time government positions. Rather, the posts focus on Mr. Buddhi's perception of their statuses as "ANGLOSAXONS." To Mr. Buddhi, "GW BUSH," "DICK CHENEY," "DONALD RUMSFELD," "LAURA BUSH," and "LYNNE CHENEY" were proxies for "ANGLOSAXONS"; their official statuses as present or former government officers or the immediate family members thereof were irrelevant.

The posts concerned the perceived acts of "ANGLOSAXONS." For example, the first paragraphs of the December 13 and 16 posts describe "Anglosaxons, who originally came from restrictive ENGLAND . . . FREE TO KILL THE NATIVE INDIANS." The author then writes, "GO IRAQIS! RAPE AND KILL THE ANGLOSAXONS...NO MERCY." Immediately after, the author references "GW BUSH" and the others. The author concludes: "THE ANGLSAXONS GET WHAT THEY DESERVE FOR 'BEING FREE AND BRAVE TO KILL THE INDIANS AND ARABS'...KILL THE MUTHERFUCKER ANGLOSAXONS, NOW!"

In the posts, the category "ANGLOSAXONS" encompasses the specified individuals. The posts focus on the author's perception of the specified individuals' statuses as "ANGLOSAXONS." Their statuses as President, Vice-President, Secretary of Defense, and wives of the President and Vice-President were never mentioned and simply did not provide the motivating force. Therefore, § 3A1.2(b) does not apply.

**B.     USSG § 3D1.4 does not apply**

The jury convicted Mr. Buddhi on eleven counts. The first ten counts concern the same two internet posts, both of whose contents are identical - the December 13 and 16 posts. Count eleven concerns the January 17 post, which though it uses different words than the December 13

and 16 posts, it expresses an identical criminal objective.

In using identical or similar words in each post, all counts of conviction involve the same victim - society at large - and all counts are connected by a common criminal objective. Where "all counts involve the same victim and two or more acts or transactions connected by a common criminal objective," the counts must be placed in a single group. U.S. SENTENCING GUIDELINES MANUAL § 3D1.2(b) (2007). If placed in a single group, under the grouping rules, there should be no increase in the total offense level.

The probation officer placed the counts into six separate groups and calculated 5.5 units for the separate groups of counts, which resulted in a five level increase in Mr. Buddhi's total offense level. For two reasons, it was error to place the counts into six groups. First, all counts of conviction involve the same primary victim. Second, all counts are connected by a common criminal objective.

The meaning of the term "victim" in USSG § 3D1.2 is described in Application Note 2, which states:

> The term 'victim' is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the 'victim' . . . is the societal interest that is harmed.

USSG § 3D1.2 cmt. n.2.

The term "victim" requires that the person described as the "victim" be "directly and most seriously affected by" the offense. *Id*. If a single person is identified as the "victim" of a threat, under the definition of "victim" in Application Note 2, that person must have reacted to the threat and experienced direct and serious harm. Where there is no "identifiable" person "directly and

most seriously affected" by the offense, the "victim" is society at large.

For purposes of identifying a "victim," Mr. Buddhi's offenses are more like drug or immigration offenses, offenses that affect interests that all members of society share. In Mr. Buddhi's case, his offenses affected the societal interest in the knowledge that government officers are safe.

The reaction to the posts reveals that the posts affected society at large. For example, government witness Hayward McMurray, who reported the December 13 post to the Secret Service, testified at trial that after reading one of the posts, he "was horrified" and "was shaking" and he testified that he "felt very strongly about this personally." (Trans. Vol. II, pp. 69, 75.)[1] His testimony is evidence that the posts affected the societal interest in knowing that government officers are safe.

As expressed in Mr. McMurray's testimony, when a government officer is threatened, the threat affects a societal interest separate from the government officer's personal interest. The threat affects potentially the broad societal interest and the particular government officer threatened, or the threat may affect only the societal interest. If the President, Vice-President, former Secretary of Defense, and wives of the President and Vice-President were not aware of Mr. Buddhi's posts such that they reacted to the posts, then the only "victim" for purposes of § 3D1.2 was the societal interest harmed, and all counts therefore would involve the same victim.

In addition to the fact that all counts of conviction involve the same victim, all counts are "connected by a common criminal objective." USSG § 3D1.2(b). Under § 3D1.2(b), counts must

---

[1] The trial transcript will be cited to by the designation "Trans. Vol. <vol. no.>, p. <pg. no.>."

6

be grouped "even if they constitute legally distinct offenses occurring at different times." *Id.*

Here, counts one through ten involve the same posts and identical content. Count eleven involves a different post but it involves a post with similar content and an identical objective. The government's attorney in his opening statement recognized a common objective that he believed linked all eleven counts: he characterized Mr. Buddhi's posts as "displaying his hatred for America and advocating its destruction." (Trans. Vol. II, p. 30.)

In sum, all eleven counts of conviction involve the same victim - society at large - and a common criminal objective connects all eleven counts. All eleven counts of conviction therefore constitute a single group; § 3D1.4 does not apply.

### C. Conclusion

For the foregoing reasons, neither USSG § 3A1.2(b) nor USSG § 3D1.4 applies. The correct total offense level is twelve and the correct guidelines sentencing range is ten to sixteen months' imprisonment.

## III. Sentencing under *Booker*, *Rita*, *Kimbrough*, and *Gall*

There is a single overarching principle that must guide a district court in imposing sentence: the statutory mandate that a court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

The statutory purposes of sentencing are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In determining the minimally sufficient sentence that satisfies the statutory purposes of sentencing, § 3553(a) directs district courts to consider:

> (1) "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1));
> (2) "the kinds of sentences available" (§ 3553(a)(3));
> (3) "the kinds of sentence and the sentencing range established" (§ 3553(a)(4));
> (4) "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority (§ 3552(a)(5));
> (5) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6)); and
> (6) "the need to provide restitution to any victims of the offense." (§ 3553(a)(7)).

The guidelines "are but one factor among those listed in [] § 3553(a)." *United States v. Carter*, No. 06-2412, 2008 WL 2466662, at *12 (7th Cir. June 19, 2008); *see United States v. Booker*, 543 U.S. 220, 245-46 (2005) (rendering the guidelines merely "advisory").

As just one factor that a district court should consider in determining an appropriate sentence, a guideline sentence is not entitled to a "legal presumption that [it] should apply." *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007). Rather, a district court must remain faithful to all factors listed in § 3553(a) "without any thumb on the scale favoring a guideline sentence." *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007). In *Carter*, the Seventh Circuit, ruling that the district court "appeared to place too much weight on the Guidelines," reversed the court's within-guideline sentence. *Carter*, 2008 WL 2466662, at *12.

Because the Supreme Court's decision in *Booker* relegated the guidelines to "advisory" status, as the Seventh Circuit instructs, "[p]ost-*Booker*, a district court has significantly more freedom than before *Booker* to fashion an appropriate sentence." *United States v. Baker*, 445 F.3d 987, 991 (7th Cir. 2006). *Booker* returned to district court's at least a part of the freedom in sentencing that the courts enjoyed in the years before the mandatory guidelines scheme.

The freedom in sentencing that district courts now enjoy permits, for example, a court to "'vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.'" *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007) (quoting Brief for United States 16). And when a district court exercises its authority to impose a sentence below the guidelines range, the court of appeal will review the sentence "under a deferential abuse-of-discretion standard." *Gall v. United States*, 128 S.Ct. 586, 591 (2007).

In fashioning an appropriate sentence, a district court should address a defendant's "principal, non-frivolous arguments based on the[] section 3553(a) factors." *United States v. Miranda*, 505 F.3d 785, 792 (7th Cir. 2007). A district court should evaluate arguments that "the case at hand falls outside the 'heartland' to which the Commission intends the individual Guidelines to apply," "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations," or "the case warrants a different sentence regardless." *Rita*, 127 S.Ct. at 2465.

In sum, in every case, rather than "evaluat[ing] a request for a variant sentence piecemeal, examining each section 3553(a) factor in isolation," a district court "should instead consider all the relevant factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, No. 06-2656, 2008 WL 2265898 at *6 (1st Cir. June 4, 2008). In considering the § 3553(a) factors as a whole, where the guidelines conflict with Congress's mandate to impose the minimally sufficient sentence that achieves the objectives of sentencing, a district court may "determine that . . . in the particular case, a within-Guidelines sentence is 'greater than necessary.'" *Kimbrough*, 128 S.Ct. at 564.

IV.     **Application of § 3553(a) to the facts of this case**

As discussed above, § 3553(a) is the governing law with respect to sentencing. Mr. Buddhi respectfully submits that § 3553(a) requires discussion of numerous factors, discussed below, that militate in favor of a sentence lower than that suggested by the guidelines. In light of all these factors and of the overarching requirement to impose the minimally sufficient sentence that achieves the objectives of sentencing, Mr. Buddhi respectfully submits that a sentence of 505 days' imprisonment is appropriate.

A.      **Nature and circumstances of the offenses**

On December 13, 2005, Mr. Buddhi submitted a post on the Yahoo! Inc. finance discussion board for the stock with symbol "SIRI." Three days later, on December 16, 2005, in a similar manner, using another person's internet protocol address without authorization, he submitted a post with identical content on the finance discussion board for the stock with symbol "JDSU." One minute later, he submitted the identical post on the same "JDSU" discussion board but included a different heading for the post. Counts one through ten concern the December 13 and 16 posts. On January 17, 2006, he submitted a post on the finance discussion board for the stock with symbol "GM." The January 17 post formed the basis for the charge in count eleven. At trial, the government presented evidence that Mr. Buddhi submitted a post on December 21, 2005 on the finance discussion board for the stock with symbol "JDSU." The December 21 post was not the subject of any count of the indictment.

All counts of conviction, as well as the December 21 post, involve speech posted on internet discussion forums. Several characteristics of Mr. Buddhi's offense conduct provide insight into the nature and circumstances of the offenses.

1.      **The Yahoo! Inc. finance discussion boards are known to contain vulgar and crude political and social commentary**

The evidence presented at trial establishes that Mr. Buddhi submitted five posts on public Yahoo! Inc. finance discussion boards known to contain vulgar and crude political and social commentary.

Though Yahoo! Inc. labels the forums as finance discussion boards, the forums contain commentary unrelated to finance. Government witness William Bachman revealed that "nonbusiness messages often exceed 50 percent . . . and these could include anything from political commentary, to advertising spam, to personal exchanges between regular members of the message board." (Trans. Vol. II, p. 114.) He further revealed that part of what is on the discussion boards is "a banter back and forth between people on political issues." (Trans. Vol. II, p. 116.) And the "banter" at times includes "offensive" commentary. *Id*.

The offensive commentary endemic to the finance discussion boards was present at the time and on the same discussion board that Mr. Buddhi submitted at least one of his posts. Though government witness Hayward McMurray testified that he had seen Mr. Buddhi's December 13 post the moment it appeared on the discussion board but had "never seen anything before or anything since anything like this whatsoever" (Trans. Vol. II, p. 72), defense witness Appolon Beaudouin, Jr. testified that one minute after the post appeared, on the same discussion board a post appeared that threatened a stock analyst named Jonathan Jacoby. (Trans. Vol. III, pp. 77-78.) A few hours later another post appeared that stated in part, "I hope Jonathan Jacoby dies tonight. I hope this lying pos gets murdered . . . ." (Trans. Vol. III, p. 79.) And a few minutes later a post appeared that stated, "Jacoby will be gangbanged . . . ." (Trans. Vol. III, p. 80.)

The testimony of Mr. Beaudouin confirms the offensive and exaggerated nature of the

content on the discussion boards, content that wrongly Mr. Buddhi believed users of the boards recognize as part of the culture of the boards such that no reasonable person familiar with the boards would perceive the statements as serious expressions of intent to kill or injure. Further, the disclaimer at the bottom of each posting, which informs that the "messages are only the opinion of the poster" and "should not be relied upon for trading or any other purpose," indicates that users of the boards are at least warned that the boards contain opinions of little truth-value. The boards are known often to contain wild and unhinged commentary.

> **2.** **The few phrases found unlawful exist in a context that suggests that, taken as a whole, the posts constitute forceful political opinions and exhortations expressed in vulgar and crude form**

In the context of the ongoing public debate concerning the war in Iraq, Mr. Buddhi expressed political opinions and exhortations in vulgar and crude form. It is significant to the nature and circumstances of the offenses that the few phrases found unlawful exist in the context of political speech. *See Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d 1058, 1102 (9th Cir. 2002) (Berzon, J., dissenting) (noting that "opinions on matters of public controversy" and speech that "urge[s] others to action" represent "the kinds of speech central to our speech-protective regime").

The posts taken as a whole reveal the political and opinionated nature of the few phrases found unlawful. In the December 13 and 16 posts, the phrase "GO IRAQIS" precedes the phrases referencing the President, Vice-President, former Secretary of Defense, and wives of the President and Vice-President. And before the phrase "GO IRAQIS," the posts allege atrocities committed by the "Anglosaxons, who originally came from restrictive ENGLAND." In this context, the author writes, "GO IRAQIS," thus exhorting the "IRAQIS" to "RAPE AND KILL

THE ANGLOSAXONS," "KILL GW BUSH," "RAPE AND KILL LAURA BUSH," KILL

DICK CHENEY," RAPE AND KILL LYNNE CHENEY," and "KILL DONALD

RUMSFELD."

Following the phrases exhorting the "IRAQIS" the author writes, "THE ANGLSAXONS

GET WHAT THEY DESERVE FOR 'BEING FREE AND BRAVE TO KILL THE INDIANS

AND ARABS.'" Put together, all these statements convey political opinions against

"ANGLOSAXONS" and those individuals perceived to personify "ANGLOSAXONS."

In the January 17, 2006 post, which supports count eleven of the indictment, the post

taken as a whole similarly constitutes "opinions on matters of public controversy" and speech

that "urge[s] others to action." *Planned Parenthood v. American Coalition of Life Activists*, 290

F.3d at 1102 (Berzon, J., dissenting). The phrases relevant to the destruction of buildings and

real properties, considered in context, represent opinions that the "ONLY WAY TO DEAL

WITH ANGLOSAXONS" is to "BOMB ALL FACILITIES SET UP BY ANGLOSAXONS";

beliefs that the "LOOTING AND KILLING WAY OF LIFE OF THE ANGLOSAXONS"

"JUSTIFIE[s]" the "BOMB[ing]" of "KEY FACILITIES IN USA AND BRITAIN"; and, finally,

exhortations to "IRAQIS" to carry out the acts described.

The totality of each post reveals a significant aspect of the nature and circumstance of the

offenses. Though a portion of the posts were deemed unlawful, taken as a whole, the posts

constitute forceful political opinions and exhortations expressed in vulgar and crude form.

**3.      The posts were not sent or specifically addressed to those individuals named
in the posts but rather were submitted on public internet discussion forums
in the form of advocacy**

Mr. Buddhi submitted the posts on public discussion forums rather than sending the posts

to the President, Vice-President, former Secretary of Defense, or the wives of the President and Vice-President. And in the postings that he submitted on public discussion forums, he did not specifically address any of those individuals named in the posts. Rather, from the content of the posts, it is clear that the posts are addressed to Iraqis.

Threatening opinions posted on public discussion forums as a part of political expression are significantly less alarming than threatening statements sent directly to victims. This is so because when a threat is sent directly to the individual threatened, "the speaker leaves no doubt that he is sending the recipient a message of some sort." *Planned Parenthood v. American Coalition of Life Activists*, 244 F.3d 1007, 1019 (9th Cir. 2001), *rev'd in part en banc*, 290 F.3d 1058 (9th Cir. 2002).

A "political statement" conveyed "through the media," however, is "far more diffuse in [its] focus." *Id.*; *see United States v. Bellrichard*, 994 F.2d 1318 (8th Cir. 1993) (noting that "[a]s a general proposition, [threatening] correspondence . . . delivered to a person at home or at work is somewhat more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering."). The political and public nature of Mr. Buddhi's posts diffuses the force of any perceived true threat.

Additional facts further diffuse the force of any perceived true threat. All the posts are addressed to Iraqis and not to any of the individuals named in the posts. For counts one through ten, the statements found unlawful are "KILL GW BUSH," "KILL DICK CHENEY," "KILL DONALD RUMSFELD," "RAPE AND KILL LAURA BUSH," and "RAPE AND KILL LYNNE CHENEY." These statements are preceded by the phrase, "GO IRAQIS." The content of the January 17 post similarly makes clear that the post is addressed to Iraqis; the post

repeatedly uses the phrase "GO IRAQIS." The fact that the posts advocate for *"IRAQIS"* to act lessens the force of any perceived threat.

In sum, the posts were not sent or specifically addressed to those named in the posts but rather were placed on public internet discussion forums in the form of advocacy to "IRAQIS." Those to whom the posts were addressed, in any common sense consideration of the posts, could not be understood to be working in concert with the author to carry out the acts described. These facts lessen the force of the perceived true threats.

### 4. Mr. Buddhi complied with government agents' request that he stop posting messages with similar content

After Secret Service Agents Wade Gault and Larry Brown spoke with Mr. Buddhi on January 18, 2006 and told him to stop posting threats against the President and Vice-President, he complied. He never again posted such messages.

### 5. Mr. Buddhi cooperated with agents investigating the internet posts

During questioning on January 18 by Agents Gault and Brown, Mr. Buddhi cooperated. Agent Gault testified that Mr. Buddhi answered all questions asked (Trans. Vol. II, p. 210), and according to Agent Gault, Mr. Buddhi admitted that he posted the messages. (Page 5 of Agent Gault's report, dated February 3, 2006; attached as Defense Exhibit P.) Also, Mr. Buddhi agreed to write and sign a statement. In his statement he described the posts as "political banter" and "political cartooning." (The January 18, 2006 signed statement; attached as Defense Exhibit Q.)

### 6. Government agents determined that Mr. Buddhi was never in fact a threat

Agent Gault filed a report soon after questioning Mr. Buddhi and wrote in the report that Mr. Buddhi posed no danger to United States Secret Service protectees at that time. (Defense Exhibit P.) He also wrote that no evidence existed to indicate that Mr. Buddhi belonged to or had

any interest in any extreme or violent organizations or had any interest in assassinations or assassins; that no evidence existed to indicate that Mr. Buddhi owned or sought to acquire firearms; and that no evidence existed to indicate that Mr. Buddhi had any plans to travel to any United States Secret Service protectee locations. *Id.* Agent Gault's report establishes that at the time of his report, Mr. Buddhi was never in fact a threat to the life of any Secret Service protectees or a threat to the safety of buildings, roads, or other infrastructure.

**B.       History and characteristics of Vikram S. Buddhi**

On May 10, 1971, in a small town in rural southern India, Kota Subbarao Buddhi and Syamala Buddhi welcomed into their lives their second child, Vikram Buddhi. Along with Vikram's elder sister, Madhavi Siva, the Buddhi family journeyed the Indian subcontinent and lived wherever the Indian navy stationed Dr. Subbarao Buddhi, a naval officer and electrical engineer. In 1973, after Vikram's younger sister, Maladhi Padmanabha, was born, the family moved to Bombay, India. The Buddhi family still today lives in Bombay.

In Bombay, Vikram attended high school at St. Joseph High School, a well-regarded public school operated by the Archdiocese of Bombay. While attending St. Joseph's, Vikram received a National Talent Search Award for extraordinary skills in mathematics and sciences. (Defense Exhibit G.) After high school, he attended St. Xavier's College and graduated in 1992 with a degree in Mathematics and Physics.

In 1988, as Vikram began studies at St. Xavier's College, his father, a decorated former captain of the Indian Navy who at the time worked on designing nuclear submarines, fell victim to false accusations that he attempted to smuggle classified documents to the United States. Dr. Subbarao Buddhi spent twenty months in jail and waged a five year legal battle to prove his

innocence. Eventually, the High Court in Bombay signed acquittal orders and ordered the Indian government to pay a small monetary compensation to Dr. Subbarao Buddhi and his family as costs for his mental suffering and financial loss. It is well-known in India that rivals within the naval scientific community framed and falsely accused him and justices of the Supreme Court in Bombay spoke out about the prosecutorial abuse that resulted in the false charges. Vikram was instrumental in securing his father's freedom. Dr. Subbarao Buddhi recalls that Vikram delivered law books to him in jail and daily encouraged him to fight to prove his innocence.

After graduating from St. Xavier's College, Vikram completed post-undergraduate studies at the Indian Institute of Technology, Bombay. In 1994, he graduated with a Master of Science degree in Pure Mathematics and was awarded a medal for earning the highest grade average in the Mathematics Department. (Defense Exhibits H, I.) Afterwards, Vikram enrolled at the Tata Institute of Fundamental Research, a premier science and mathematics academy, to work toward a Ph.D. in Mathematics. In 1996, Vikram transferred to Purdue University.

During his studies at Purdue, for almost ten years, Vikram worked as a teaching assistant and taught algebra, calculus, and differential equations to undergraduate students. The Mathematics Department and the Graduate School at Purdue recognized his outstanding teaching ability and twice awarded him a Best Teacher Award. (Defense Exhibit F.) Presently, at the Metropolitan Correctional Center ("MCC") in Chicago where Mr. Buddhi is incarcerated, he teaches mathematics to prisoners enrolled in the MCC's GED program. (Defense Exhibit K.)

While at Purdue, Vikram earned a second Master of Science degree in Mathematics. (Defense Exhibit J.) In 2004, however, he transferred to the Department of Industrial Engineering because he wanted to enroll in a Ph.D. program that offered better job prospects.

At the time of his arrest in early 2006, Vikram was developing a diagnostic tool that would enable physicians to quickly detect breast cancer from tissue samples. Working alongside the chair of the Department of Industrial Engineering, Vikram created software programs and technology that through an automated process identified cancer cells by their characteristics. In addition, he was working with another professor on a mathematical program that improved the efficiency of business and industrial operations.

Vikram worked in academic research and contributed his knowledge and intellect toward advancing real-world applications of technology. Regardless of the offense conduct at issue in this case, during his time as a Ph.D. student in this country, Vikram contributed to social welfare.

In a letter to the Court, Professor James Krogmeier of Purdue University writes that he got to know Vikram during Vikram's studies at Purdue and he recognizes Vikram as "a promising student with the potential to be an outstanding researcher in applied mathematics." (Defense Exhibit B.) Professor Krogmeier writes that he "wish[es] that someday [Vikram] may return to work in the engineering and applied mathematics fields." *Id.*

While out on bail, though Vikram had some police contact, he worked hard to continue to contribute to the community. Vikram volunteered with Indiana Legal Services, the Indiana Veterans' Homes, and the Lafayette Adult Resources Academy. The defense attaches to this Memorandum letters that attest to Vikram's work with all three organizations. (Defense Exhibits C, D, and E.) In particular, Mr. Edward Stachowicz, the managing attorney at Indiana Legal Services, remembers Vikram as "very conscientious and considerate" and notes his contributions to the office's mission to provide legal services to the community. (Defense Exhibit C.)

During the time that Vikram volunteered with the community organizations, for most of

the time that he was out on bail, he lived at Aldersgate House in West Lafayette, Indiana. Aldersgate House is a residence owned by the United Methodist Campus Ministry at Purdue University. The Ministry is operated by Reverends Glen and Lana Robyne. Reverends Robyne write that they remember Vikram as "soft-spoken, respectful, insightful, and curious about things he did not fully understand." (Defense Exhibit A.) They note that he has a "caring nature" and that he had "grown spiritually in his year" at the Ministry. *Id.* They write to the Court that they "hope that his spiritual progress will not be undermined by a long prison term." *Id.*

In sum, the people who worked with and provided spiritual counsel to Vikram recognize his positive characteristics and the fact that he seeks to better himself and contribute to the community. Vikram respectfully asks that this Court also consider his positive attributes and contributions to the community.

C.     **The kinds of sentences available**

None of the statutes under which the government prosecuted Mr. Buddhi requires a sentencing court to impose a term of imprisonment. Each statute expressly states: "shall be imprisoned . . . or fined . . . or both." 18 U.S.C. §§ 844(e), 871(a), 875(c), and 879(a).

Mr. Buddhi submits to this Court that in light of the nature and circumstances of the offenses and of his personal history and characteristics, and in light of the grounds for a non-guideline sentence discussed below, a term of imprisonment of 505 days is appropriate.

D.     **Mr. Buddhi's case falls far outside the "heartland" to which the Sentencing Commission intends the guideline sentence to apply**

Mr. Buddhi's case is an atypical true threats case. It is atypical for two reasons: he did not communicate his posts directly to the individuals named in the posts or directly and privately to others with access to the individuals named; and he did not convey that he, or anyone acting in

concert with him, will carry out the acts described. The absence in a true threats case of these characteristics lessens the force of the threat at issue and places the case outside the "heartland" of conduct the guideline sentence is intended to punish.

In creating the guideline for threats cases, the Sentencing Commission intended that the guideline sentence apply to the typical case. The introduction to the Guidelines Manual notes that the Commission "intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S. SENTENCING GUIDELINES MANUAL § 1A1.1, editorial note, part A, section 4(b).

For the "atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm," a non-guideline sentence is appropriate. *Id.*; *see Koon v. United States*, 518 U.S. 81, 93 (1996) (citation omitted) ("[T]he Commission did not adequately take into account cases that are, for one reason or another, 'unusual.'").

In Mr. Buddhi's case, his offense conduct is significantly less severe than the offense "heartland" for true threats cases. A way to determine an offense "heartland" is to consider the conduct at issue in reported cases. *See United States v. D'Amario*, 350 F.3d 348, 357 (3rd Cir. 2003) (asserting that "[a] guideline need not apply to a great number of cases in order to have a 'heartland,'" and finding that the government in the case "cited a sufficient number of reported cases" to describe an offense "heartland").

The following reported Seventh Circuit cases involve offenses prosecuted under 18 U.S.C. §§ 844(e), 871(a), 875(c), and 876(c); though no reported cases involve offenses under § 879(a), the nature of an offense under § 879(a) is similar to the nature of offenses under §§ 875(c), 876(c), and 871(a); and though Mr. Buddhi was not charged under § 876(c), an offense

under § 876(c) is analogous to an offense under § 875(c).

Section 844(e): *United States v. Frazer*, 391 F.3d 866 (7th Cir. 2004); *United States v. Horton*, 98 F.3d 313 (7th Cir. 1996).

Section 871(a): *United States v. Fuller*, 387 F.3d 643 (7th Cir. 2004); *United States v. Williams*, 102 F.3d 923 (7th Cir. 1996); *United States v. Sauerwein*, 5 F.3d 275 (7th Cir. 1993); *United States v. Poff*, 926 F.2d 588 (7th Cir. 1991); *United States v. McCaleb*, 908 F.2d 176 (7th Cir. 1990); *United States v. Hoffman*, 806 F.2d 703 (7th Cir. 1986).

Section 875(c): *United States v. Stewart*, 411 F.3d 825 (7th Cir. 2005); *United States v. Carter*, 111 F.3d 509 (7th Cir. 1997); *United States v. Sullivan*, 916 F.2d 417 (7th Cir. 1990); *Bownes v. United States*, no. 06-cv-0756-MJR, 2007 WL 1686964 (S.D. IL June 8, 2007); *United States v. Wabol*, no. 3:04-CR-62-TS, 2006 WL 3775978 (N.D. IN Dec. 21, 2006).

Section 876(c): *United States v. Farris*, 448 F.3d 965 (7th Cir. 2006); *United States v. Bohanon*, 290 F.3d 869 (7th Cir. 2002); *United States v. Siegler*, 272 F.3d 975 (7th Cir. 2001); *United States v. Thomas*, 155 F.3d 833 (7th Cir. 1998); *United States v. Sotelo*, 94 F.3d 1037 (7th Cir. 1996); *United States v. Sullivan*, 75 F.3d 297 (7th Cir. 1996); *United States v. Aman*, 31 F.3d 550 (7th Cir. 1994); *United States v. Fonner*, 920 F.2d 1330 (7th Cir. 1990); *United States v. Schneider*, 910 F.2d 1569 (7th Cir. 1990); *United States v. Khorrami*, 895 F.2d 1186 (7th Cir. 1990); *United States v. Lumpkins*, 845 F.2d 1444 (7th Cir. 1988); *United States v. Chapman*, 440 F.Supp. 1269 (E.D. WI 1977).

A review of the cases cited reveals similarities that establish a "heartland" for threat offenses. First, all cases involve threats that defendants communicate directly to the individuals named in the communications or directly and privately to others with access to the individuals

named. Second, all cases involve threats that communicate that the makers of the threats, or others acting in concert with the makers, will carry out the acts described.

1.    **Mr. Buddhi's case does not involve threats that he sent directly to the individuals named in the communications or directly and privately to others with access to the individuals named**

The typical true threats case involves a threat that a defendant sends directly to the person he threatens or sends directly and privately to other individuals who easily can convey the threat to the person threatened. In contrast, Mr. Buddhi submitted his posts on public internet discussion forums.

Threats communicated directly and privately cause significantly more fear than threatening opinions posted as a part of political expression on public discussion forums known to contain vulgar and crude political and social commentary. *See Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d 1058, 1099 (9th Cir. 2002) (en banc) (Kozinski, J., dissenting) (recognizing case law instructing that for purposes of determining the threatening nature of speech, "it makes a big difference whether [the speech] is contained in a private communication . . . or is made during the course of public discourse.").

Why does it matter whether a threatening statement is communicated privately or is submitted on a public discussion board? It matters because a threat communicated privately is intended to "target[] the recipient personally . . . leav[ing] no doubt that [the maker of the threat] is sending the recipient a message of some sort." *Planned Parenthood v. American Coalition of Life Activists*, 244 F.3d 1007, 1019 (9th Cir. 2001), *rev'd in part en banc*, 290 F.3d 1058 (9th Cir. 2002). Whereas "[p]rivate speech is aimed only at its target . . . [p]ublic speech, by contrast, seeks to move public opinion . . . ." *Planned Parenthood v. American Coalition of Life Activists*,

22

290 F.3d at 1099 (en banc) (Kozinski, J., dissenting). Threatening political opinions communicated "through the media . . . are far more diffuse in their focus," and consequently, far less threatening in nature. *Planned Parenthood v. American Coalition of Life Activists*, 244 F.3d at 1019.

The typical true threats case in the Seventh Circuit involves private speech targeted at the individual named in the communication. For example, in *United States v. Hoffman*, 806 F.2d 703 (7th Cir. 1986), the defendant sent via private mail a letter to the White House and wrote in the letter, "Ronnie, Listen Chump! Resign or You'll Get Your Brains Blown Out!" *Hoffman*, 806 F.2d at 704. The letter included a crude drawing of a pistol with a bullet emerging from the barrel. *Id*. The Seventh Circuit noted as significant the fact that the defendant "took a deliberate number of steps to ensure that the threat would be communicated to the President," and this fact "clearly distinguished" the case from the "political hyperbole" held lawful in *Watts v. United States*, 394 U.S. 705 (1969). *Id.* at 706. Mr. Buddhi took no steps to communicate his statements to the President or to any of the individuals named in the posts.

Further, Mr. Buddhi did not communicate his posts to others privately either by mail or in person. His posts, though "ugly" and "frightening," were not sent directly to anyone and therefore are not the kinds of speech normally deemed true threats. *Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d at 1089 (Reinhardt, J., dissenting). As noted by Judge Reinhardt, "[i]t is a fundamental tenet of First Amendment jurisprudence that political speech in a public arena is different from purely private speech directed at an individual . . . [and] ugly or frightening as it may sometimes be, [political speech] lies at the heart of our democratic process." *Id*. at 1088-89.

In sum, Mr. Buddhi never sent his posts to the White House, the Secret Service, or to any individual. He submitted the posts on public discussion boards as a part of political expression and did so on public discussion boards known by users of the boards to contain offensive political and social commentary. This fact lessens the force of the perceived true threat; it places his internet posts far outside the "heartland" of conduct the Commission intends the guideline sentence to encompass.

2.      **Mr. Buddhi's case does not involve threats that communicate that he, or others acting in concert with him, will carry out the acts described**

The internet posts at issue, though found unlawful, are more like advocacy rather than the kinds of communications that constitute typical true threats cases - the "heartland" of true threats cases: clear, specific, and direct threats that the maker of the threat, or others acting in concert with the maker, will carry out the acts described. *See Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d 1058, 1091 (9th Cir. 2002) (en banc) (Kozinski, J., dissenting) ("In order for the statement to be a threat, it must send the message that the speakers themselves - or individuals acting in concert with them - will engage in physical violence.").

Though a "true threat" does not require a finding that the defendant actually intended to carry out the threat, it does require a finding of "an apparent determination to carry out the threat." (Court's Jury Instruction # 24, docket # 101.) That is, in order to find a true threat, the finder of fact at least must find that a reasonable recipient of the threat would perceive a determination to carry out the threat - a perceived intent to kill, injure, or bomb.

Courts distinguish between calls to action expressed as a part of political speech and specific, direct threats that evidence an intent, perceived or actual, that the maker of the threat, or others acting in concert with the maker, will kill, injure, or bomb. *See Planned Parenthood v.*

24

*American Coalition of Life Activists*, 290 F.3d 1058, 1072 (9th Cir. 2002) (en banc) (recognizing

that "[i]f [defendants] had merely endorsed or encouraged the violent actions of others, [their]

speech would be protected.").

In *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), the "Supreme Court held

that, despite [the speaker's] express call for violence, and the context of actual violence, [the

speaker's] statements were protected, because they were quintessentially political statements

made at a public rally, rather than directly to his targets." *Planned Parenthood v. American

Coalition of Life Activists*, 244 F.3d 1007, 1019 (9th Cir. 2001), *rev'd in part en banc*, 290 F.3d

1058 (9th Cir. 2002). Mr. Buddhi's statements, though found unlawful true threats, are more akin

to the advocacy for violence held as protected speech in *Claiborne Hardware* than to the direct

threats normally prosecuted under the threat statutes.

The Assistant United States Attorney ("AUSA") who prosecuted the case and the

government's witnesses all interpreted Mr. Buddhi's internet posts as advocacy rather than as

direct threats that he, or anyone acting in concert with him, would carry out the acts described.

Repeatedly, the AUSA during trial framed Mr. Buddhi's posts as advocacy rather than as

direct threats. The following are some examples:

> "Did you ever see in any of these rooms or message boards advocating the killing
> of Dick Cheney?" (Trans. Vol. I, p. 89) (redirect examination of government
> witness Hayward McMurray);

> "Had you ever seen one in the whole time you were on there that were advocating
> the assassination of the president of the United States . . . ?" (Trans. Vol. II, p.
> 101) (direct examination of government witness William Bachman);

> "Have you ever seen any postings in any of these financial rooms where there was
> an inciting to rape and kill Laura Bush?" (Trans. Vol. II, p. 102) (direct
> examination of government witness William Bachman);

> "Had you ever seen any posting the whole time you were going to that message board in which an individual was calling for the assassination of the president?" (Trans. Vol. II, pp. 134-35) (direct examination of government witness John Neff);
>
> "It's not enough he's urging other people and threatening the United States by this posting. Go Iraqis. Use Americans." (Trans. Vol. IV, p. 8) (closing statement of AUSA).

Clearly, the AUSA interpreted Mr. Buddhi's internet posts as advocacy, inciting others, or calls for others to act; he did not frame the posts as direct threats that Mr. Buddhi, or anyone acting in concert with him, would carry out the acts described.

Similarly, government witness Secret Service Agent Wade Gault interpreted the posts as advocacy. Agent Gault wrote in his email to the government's witnesses that "Buddhi's whole defense is going to be that he, a non-citizen, should be able to advocate the assassination of the president, other political figures and US citizens . . . ." (Trans. Vol. II, p. 226.) Also, Agent Gault testified at trial that "in those postings . . . it takes the prospectus [sic] of advocating the killing of the president, and all the other political figures that he mentioned." (Trans. Vol. II, p. 228.)

Government witnesses Hayward McMurray, William Bachman, and John Neff all also interpreted the posts as advocating Iraqis to carry out the acts described. Mr. McMurray testified on cross-examination as follows:

> Q.    Well, it was advocating the Iraqis to kill G.W. Bush; correct?
> A.    Yes.
> Q.    And it was advocating the Iraqis to rape and kill Laura Bush; correct?
> A.    That is correct.
> Q.    And advocating the Iraqis to kill Dick Cheney, the white fat pig?
> A.    That is correct.
> Q.    And advocating the Iraqis to kill Donald Rumsfeld, the Old geezer crook?
> A.    Yes sir.

(Trans. Vol. II, p. 83.)

Mr. Bachman testified on cross-examination:

Q.    Now, your impression from these posts, they were a call for the president to be killed, correct?
A.    That's exactly - -
Q.    Among other things?
A.    That's exactly what my impression was.

(Trans. Vol. II, p. 117.)

Finally, Mr. Neff testified on cross-examination:

Q.    Did you believe this posting, call for assassination of G.W. Bush, was advocating the assassination of G.W. Bush?
A.    Absolutely.

(Trans. Vol. II, p. 145.)

The AUSA who prosecuted the case, the government's case agent, and the government's witnesses who reported the posts to the Secret Service all interpreted Mr. Buddhi's posts as advocating others - Iraqis - to carry out the acts described. Unlike in Mr. Buddhi's case, all the reported cases in the Seventh Circuit that involve prosecutions under 18 U.S.C. §§ 871(a), 875(c), 879(a), 844(e), or 876(c) deal with direct threats that communicate that the makers of the threats, or others acting in concert with the makers, will carry out the acts described.

In *United States v. Khorrami*, 895 F.2d 1186 (7th Cir. 1990), the Seventh Circuit case most analogous to Mr. Buddhi's case, the defendant sent via private mail a "wanted" poster to the Jewish National Fund that contained phrases such as "Execute now" and images such as swastikas next to pictures of various individuals. *Khorrami*, 895 F.2d at 1189. The defendant sent the "wanted" poster following "a six-month campaign of profane, vulgar and vicious telephone calls." *Id.* at 1193. The Seventh Circuit ruled that "[i]n the context of Khorrami's

personal vendetta campaign of telephonic and postal harassment waged against the Jewish National Fund, a reasonable jury could conclude that the recipients of Khorrami's 'wanted' poster would interpret this poster as a serious threat to inflict bodily harm upon another rather than as mere 'political hyperbole.'" *Id.*

In a case like *Khorrami*, where the communication itself did not make clear who would carry out the threat, the context, which included the fact that the defendant sent the communication directly and privately following a six month campaign of harassment, made it clear that the defendant would be the one to carry out the threat. Mr. Buddhi's internet posts are less clearly direct threats than the communication found unlawful in *Khorrami*.

Outside the Seventh Circuit, the following cases cited previously by this Court, *see* docket # 67 (Order denying Defendant's Motions to Dismiss), represent the cases most similar to Mr. Buddhi's case: *United States v. Merrill*, 746 F.2d 458 (9th Cir. 1984), *United States v. Humphreys*, 352 F.3d 1175 (8th Cir. 2003), and *United States v. Bellrichard*, 994 F.2d 1318 (8th Cir. 1993). Considering the facts of each case, Mr. Buddhi's posts are less clearly direct threats than the threats in *Merrill*, *Humphreys*, or *Bellrichard*.

In *Merrill*, the defendant mailed to community leaders in Phoenix, Arizona materials and letters that contained the words "Kill Reagan." *Merrill*, 746 F.2d at 460. The letters "included macabre and bloody depictions of President Reagan" alongside the words "Kill Reagan." *Id.* Many of the letters the defendant mailed "contained live .22 caliber rim fire bullets." *Id.*

*Merrill* involved speech and non-speech elements; the defendant in *Merrill* sent via private mail letters that contained live bullets, which, considered alongside the bloody depictions of the President, conveyed clearly a direct threat to kill. Mr. Buddhi's case involves speech only

and it involves speech posted on public discussion forums that the government's witnesses testified contain vulgar and crude political and social commentary.

In *Humphreys*, the defendant, in part, stated in an internet chat room: "I AM GOING TO PRAY FOR A BURNING BUSH. GET IT? SO IF YOU HEAR THAT A MAN RUNS UP AND THROWS GASOLINE AND A MATCH TO BUSH YOU WILL KNOW THAT GOD DID SPEAK THROUGH THE BURNING BUSH. LOL [laugh out loud]." *Humphreys*, 352 F.3d at 1177. The defendant posted the statement *while also* having "communicated his threat about burning Bush to different people on different occasions, specifically . . . by fax to the White House, and in person to three individuals at different times." *Id*. Eventually, in Sioux Falls, Idaho, a hotel employee, aware that the President was in town, called law enforcement to report the defendant's suspicious behavior. Brief for the Appellant, *Humphreys*, 352. F.3d 1175 (No. 03-1014), WL 23062798, at *5.

*Humphreys* involved a defendant who sent his threat directly to the White House and who also communicated his threat orally and in person and eventually was arrested in the same city where the President was located. Mr. Buddhi never communicated directly to the White House or privately to any government officer or other individual and he never planned to travel to any United States Secret Service protectee locations.

In *Bellrichard*, the defendant used language such as "Dump her in the incinerator!"; "The 1st thing that ought to get burned in that proposed incinerator is your God-damned dead body." *Bellrichard*, 994 F.2d at 1321 n.5. The defendant argued that the letters he mailed were not true threats because he "did not directly say that he intended to" do the harm described. *Id*. at 1322.

The Eighth Circuit, "focus[ing] on the context," noted that the "language [in other letters

sent] that Bellrichard is 'tempted to form an army which will line you 3 motherfuckers up against a wall while he personally pulls the trigger' is a sufficiently direct suggestion of violence to be viewed by a reasonable person as a true threat to the recipients." *Id*. at 1321-22. In addition, the defendant "sent [the letters] to the recipients' home or work addresses," and the court recognized that "[a]s a general proposition, correspondence of this sort delivered to a person at home or at work is somewhat more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering." *Id*. at 1321. Mr. Buddhi did not send his speech directly to the White House, Secret Service, or any individual; his posts were more like oral statements made at a public gathering; and nothing in the context of his case indicated that he, or anyone acting in concert with him, would carry out the acts described.

In *Merrill*, *Humphreys*, and *Bellrichard*, as in *Khorrami*, even though the communications themselves did not always convey by word who would would be the actor, the totality of the offense conduct - the context - in each case established that the defendants threatened that they, or those acting in concert with them, would be the ones to carry out the acts described. Mr. Buddhi's internet posts are less clearly direct threats than the threats in *Merrill*, *Humphreys*, *Bellrichard*, or *Khorrami*.

In sum, Mr. Buddhi's case involves communications that are less clearly direct threats to kill, injure, or bomb than any of the communications in any of the cases reviewed by the defense in any circuit; his offense conduct is significantly less severe than the norm for true threats cases.

**3.   Conclusion: Mr. Buddhi's offense conduct falls far outside the "heartland" of conduct the guideline sentence encompasses and this fact supports a below-guideline sentence of 505 days' imprisonment**

Mr. Buddhi's internet posts are not the kinds of direct threats that the government

normally prosecutes under the threat statutes. He submitted the posts on public discussion forums rather than sending the posts to any individual; and his posts were more akin to advocacy submitted as a part of political expression rather than direct threats that he, or anyone acting in concert with him, would carry out the acts described.

For these reasons, Mr. Buddhi's offense conduct is significantly less severe than the "heartland" of conduct the Commission intends the guideline sentence to encompass. Mr. Buddhi submits that this fact supports a below-guideline sentence of 505 days' imprisonment.

**E.      A sentence of 505 days' imprisonment reflects the seriousness of the offenses**

Congress requires that any sentence imposed "reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(2)(A). In Mr. Buddhi's case, a five level enhancement under the grouping rules results in a guideline sentence that overstates the seriousness of the offenses. Even if technically, pursuant to the grouping rules in USSG § 3D1.4, a five level increase in Mr. Buddhi's total offense level applies, in the factual context of his case, the increase is inappropriate.

The Sentencing Commission's stated objectives in creating the grouping rules was to account properly for "significant additional criminal conduct." U.S. SENTENCING GUIDELINES MANUAL ch. 3, pt. D, introductory cmt. (2007). At the same time, it sought "to prevent multiple punishment for substantially identical offense conduct." *Id*. The Commission recognized that "the formal charging decision" may sometimes overstate the extent of the criminal conduct. *Id*. In Mr. Buddhi's case, the government presented before the jury an eleven count indictment. Counts one through ten were based on the same posts; count eleven was based on the January 17 post.

Preliminarily, it is important to recognize that Mr. Buddhi's offenses are not among "the

more commonly prosecuted federal offenses" that the Commission had "in mind" when it drafted the grouping rules. *Id*. Rather, when it drafted the grouping rules for offenses "oriented more toward single episodes of criminal behavior," which the Commission instructs includes threat offenses, it focused on offenses such as "independent instances of assault or robbery." *Id*.

Assault and robbery are the kinds of offenses the Commission had "in mind" when it drafted the grouping rules. *Id*. The five level enhancement applied under the grouping rules must be considered in this light.

Considered in the light that the Commission had "in mind" offenses such as assault or robbery when it enacted the grouping rules, the policy objectives of the grouping rules caution against applying a five level enhancement in a multiple-count case like that of Mr. Buddhi. In determining how to treat multiple-count indictments, the Commission focused on the distinctness of the criminal conduct encompassed in each grouping of counts and on the nature of those classified as the "victims" of the offenses.

Unlike offenses that involve independent instances of assault or robbery, all Mr. Buddhi's counts of conviction involve substantially identical offense conduct. Counts one through ten are based on the same posts - the December 13 and 16 posts. The December 13 and 16 posts are substantially identical. And count eleven, though it involved a different post, involved a post with similar content and an identical objective. As characterized by the government's attorney, all Mr. Buddhi's posts involved the same objective: "displaying his hatred for America and advocating its destruction." (Trans. Vol. II, p. 30.)

In addition to all counts of conviction involving substantially identical content and the same objective, all the offense conduct elicited a singular reaction. The Secret Service reacted to

the posts in a singular manner; it did not have to react differently for each "victim." After concerned members of the public contacted the Secret Service, Agents Gault and Brown visited and interviewed Mr. Buddhi. Agent Gault then filed a report in which he concluded that Mr. Buddhi "does not appear to present a danger to USSS protectees at this time." (Defense Exhibit R.) Based on their singular reaction to the posts, agents resolved the matter.

In contrast, for offenses such as assault or robbery, which are the offenses the Commission had "in mind" when it drafted the grouping rules, when there are "independent instances" of assault or robbery involving distinct "victims," government agents react in multiple ways to deal with the independent victims.

Also, unlike offenses such as assault or robbery, which involve distinct "victims" "directly and most seriously affected by" the criminal conduct, in Mr. Buddhi's case, society at large was the primary "victim" for all counts of conviction. USSG § 3D1.2 cmt. n.2. The internet posts affected the societal interest in the knowledge that government officers are safe.

The public at large - society - was the primary victim of all counts of conviction; and counts one through eleven involved substantially identical offense conduct. None of the counts of conviction constituted "significant additional criminal conduct" such that any of the counts required "incremental punishment" to account fully for all the offense conduct. USSG ch. 3, pt. D, introductory cmt. Rather, providing "incremental punishment" pursuant to the grouping rules through a five level increase in Mr. Buddhi's total offense level constitutes "multiple punishment for substantially identical offense conduct." *Id*.

In sum, even if the Court determines that technically USSG § 3D1.4 applies, in the factual context of Mr. Buddhi's case, an enhancement under § 3D1.4 subverts the policy

objectives that form the grouping rule's foundation. Mr. Buddhi respectfully asks the Court to consider the policy objectives of the grouping rules and find that a five level enhancement under USSG § 3D1.4 overstates the seriousness of Mr. Buddhi's offenses; a sentence of 505 days' imprisonment properly reflects the seriousness of the offenses and is sufficient to comply with all the statutory purposes of sentencing.

F.  **Mr. Buddhi's extreme vulnerability to victimization in prison and history of actual victimization in prison and his status as a deportable alien support a sentence of 505 days' imprisonment**

In Mr. Buddhi's case, two additional circumstances support a sentence of 505 days' imprisonment: (1) Mr. Buddhi's extreme vulnerability to victimization in prison and history of actual victimization in prison and (2) the fact that the government almost certainly will deport him to India as soon as he serves any term of imprisonment imposed.

1.  **Mr. Buddhi's extreme vulnerability to victimization and history of actual victimization support a sentence of 505 days' imprisonment**

Vulnerability to abuse in prison and history of actual victimization in prison are factors that properly support a below-guideline sentence. *United States v. Wilke*, 156 F.3d 749, 754 (7th Cir. 1998) (citing *United States v. Lara*, 905 F.2d 599, 603 (2nd Cir. 1990)). Courts further recognize that, in the context of vulnerability to victimization, a district court may consider as factors warranting a below-guideline sentence a defendant's physical characteristics and demeanor. *Id.*; *see also United States v. Gonzalez*, 945 F.2d 525 (2nd Cir. 1991) (noting that physical characteristics that would make defendant "prey to the long-term criminals with whom he will be associated in prison" are factors that properly supported a below-guideline sentence).

In addition to considering physical characteristics and demeanor in the context of

potential or actual victimization as factors warranting a below-guideline sentence, a district court may also consider the notoriety a case generates. In *Koon v. United States*, 518 U.S. 81 (1996), the Supreme Court approved a district court's downward variance from the guideline sentence based on the district court's finding that the case's "notoriety . . . coupled with the defendants' status as police officers" made the defendants "unusually susceptible to prison abuse." *Koon*, 518 U.S. at 112. Though Mr. Buddhi's case has not garnered the media attention that the defendants' cases in *Koon* garnered, once inmates and jail staff learn of Mr. Buddhi's offense conduct, the case generates notoriety within the walls of the jail complex.

In Mr. Buddhi's case, his physical stature and demeanor as well as the notoriety his case generates all contribute to his physical victimization and create an undue risk of continued victimization. Mr. Buddhi stands 5 feet 6 inches tall, is slight in build, and exhibits a diminutive demeanor. His offense conduct involves vulgar and hateful statements directed at Anglosaxons generally and Americans specifically.

In *Wilke*, *Lara*, and *Gonzalez*, the circuit courts focused on potential victimization; they did not require, as a prerequisite to a below-guideline sentence, that a defendant establish that he had already been victimized. Mr. Buddhi's case presents both potential and actual victimization.

During the pre-trial and post-trial periods, Mr. Buddhi has been jailed at Hammond City Jail, Porter County Jail, Lake County Jail, and the Metropolitan Correctional Center in Chicago. He has been physically victimized at every facility at which he has been jailed.

At Hammond City Jail, on May 14, 2006, an inmate approached Mr. Buddhi and told him that he was a "terrorist" and that people like him did not belong in this country. From the time Mr. Buddhi arrived at the jail on April 14, 2006, some inmates had been calling him a "terrorist."

The inmate, a one-time professional boxer, then struck with a closed fist the underside of Mr. Buddhi's chin and forced his head all the way backwards. Mr. Buddhi reported the incident to jail staff. Though he repeatedly asked for medical attention, he was taken to Saint Margaret Mercy Hospital only after federal marshals learned of the incident more than a week later. At the hospital a doctor determined that Mr. Buddhi suffered a cervical strain and prescribed pain medication. (Defense Exhibit L.) Upon Mr. Buddhi's release from the hospital, immediately the federal marshal transferred him to Porter County Jail.

At Porter County Jail, in mid-June of 2006, a cell-mate pulled Mr. Buddhi down from the top bunk onto the concrete floor below. Mr. Buddhi hit his head and elbow on the floor; he did not respond. Jail guards immediately locked down the cell block, removed Mr. Buddhi from the cell, and ensured that he received medical attention. Eventually, a doctor prescribed pain medication. (Defense Exhibit M.)

In mid-July of 2006, Mr. Buddhi secured bail and was released. He returned to custody on June 11, 2007 and was incarcerated at Hammond City Jail. On June 29, 2007, after trial, the federal marshal transferred him to Lake County Jail.

At Lake County Jail, throughout October of 2007, an inmate repeatedly harassed Mr. Buddhi calling him a "crazy Arab" and a "crackhead." On October 25, 2007, the inmate approached Mr. Buddhi as he waited for a food tray and said that people like him should not be in this country. He called Mr. Buddhi a "crackhead." The inmate then pushed Mr. Buddhi's head up against a metal door frame. Mr. Buddhi suffered a one inch laceration to his skull. (Defense Exhibit N.) He received medical attention and jail staff moved him to a holding cell.

A week later, after learning of the incident, Mr. Buddhi's attorney requested that the

federal marshal move him to the Metropolitan Correctional Center ("MCC") in Chicago. Mr. Buddhi now is incarcerated at the MCC.

At the MCC, on November 26, 2007, an inmate assaulted Mr. Buddhi because he had set the captioning option for the television to the "on" position. Jail staff learned of the incident and moved Mr. Buddhi to administrative detention. (Defense Exhibit O.) Eventually, staff moved him to the pretrial holding area where presently he is incarcerated.

In *Wilke*, *Lara*, and *Gonzalez* the defendants had not even yet been victimized. Here, Mr. Buddhi has actually been victimized at every institution at which he has been jailed.

Mr. Buddhi did not violate the law when he used vulgar and crude language against Anglosaxons and Americans and urged that America lose the war in Iraq. Yet, because of those statements and his appearance as a foreigner of diminutive stature and demeanor, he has suffered the additional punishment of physical victimization and is vulnerable to future abuse in prison in ways that other defendants convicted of the same crimes are not vulnerable.

For two reasons, his extreme vulnerability to victimization and history of actual victimization support a sentence of 505 days' imprisonment. "[R]egardless," *Rita v. United States*, 127 S.Ct. 2456, 2468, 2465 (2007), of the guideline sentence, any term of imprisonment beyond 505 days is unduly severe. Mr. Buddhi already suffered physical victimization in prison and is likely to suffer further victimization if imprisoned any longer.

Also, relative to other defendants convicted for the same crimes, a guideline sentence creates unwarranted sentence "*similarities.*" *Gall v. United States*, 128 S.Ct. 586, 600 (2007) (italics in original). Mr. Buddhi is subject to the same guideline sentence as other defendants convicted under similar circumstances even though he already suffered the additional

punishment of physical victimization and likely, if imprisoned any longer, will continue to suffer physical victimization. For the reasons discussed, Mr. Buddhi's history of actual victimization and extreme vulnerability to future victimization support a sentence of 505 days' imprisonment.

2.    **An almost certain deportation to India supports a sentence of 505 days' imprisonment**

Under 8 U.S.C. § 1227(a)(2)(D)(ii), Mr. Buddhi is a "deportable alien" who "shall, upon order of the attorney general, be removed." 18 U.S.C. § 1227(a)(2)(D)(ii). He is a "deportable alien" because he was convicted of an offense under 18 U.S.C. § 871. *Id*. As soon as Mr. Buddhi serves any term of imprisonment imposed, because he is an Indian citizen, he almost certainly will be deported to India.

An almost certain deportation to India supports a sentence of 505 days' imprisonment for two reasons. First, any further term of imprisonment is unnecessary to protect the public. Under 18 U.S.C. § 3553(a)(2)(C), the Court, "in determining the particular sentence to be imposed, shall consider . . . the need for the sentence imposed . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). A sentence greater than 505 days' imprisonment is unnecessary to protect the public from any further crimes that may be committed because a deportation ensures that the public is protected.

Second, a guideline sentence creates unwarranted sentence "*similarities*." *Gall v. U nited States*, 128 S.Ct. 586, 600 (2007) (italics in original). Mr. Buddhi will suffer the significant additional punishment of deportation; a defendant who is a United States citizen convicted of the same crimes, however, is subject to the same guideline sentence but will not suffer a deportation.

A deportation is a significant additional punishment not incorporated into the guidelines. Unlike illegal re-entry offenses, offenses for which the Sentencing Commission took into

account in drafting the guidelines the fact that persons who ordinarily commit such crimes are likely to be deported after serving their sentences, offenses under the threat statutes ordinarily do not involve defendants who likely would be deported. The Commission, therefore, did not incorporate into the guideline for threat offenses the fact of deportation.

A deportation to India is a significant additional punishment that will severely adversely affect Mr. Buddhi. When deported, Mr. Buddhi will abandon the more than ten years of work he put forth at Purdue University in his pursuit of a Ph.D. degree. Mr. Buddhi arrived in the United States in August of 1996 and has not since returned to India. Before arriving in the United States, in India he had already earned a Master of Science degree in Pure Mathematics. The labor he put forth toward a Ph.D. degree in this country will not transfer; he will start from scratch and will lose the unique opportunity this country presents to youngsters like him who immigrate to seek better lives for themselves and their families.

In sum, an almost certain deportation to India supports a sentence of 505 days' imprisonment for two reasons. First, a deportation ensures that the public is protected; no need exists to impose a sentence over 505 days' imprisonment. Second, a guideline sentence creates unwarranted sentence "*similarities*." *Gall*, 128 S.Ct. at 600. Mr. Buddhi will suffer the significant punishment of deportation; a defendant who is a United States citizen convicted of the same crimes, however, is subject to the same guideline sentence but will not suffer a deportation.

## V.      Conclusion

Vikram immigrated to this country an eager youngster on the path toward a future as an applied mathematician; he will leave a felon; a felon beaten up and ridiculed while spending

more than 16 months in United States jails. Just punishment has been had; the force of the law has been realized. There is no purpose served by keeping Vikram imprisoned any longer.

In light of the nature and circumstances of the offenses and his history and characteristics, and in light of the grounds for a below-guideline sentence discussed above, Vikram respectfully submits to the Court that a sentence of 505 days' imprisonment, which equates to time served, is sufficient, but not greater than necessary, to achieve the objectives of sentencing Congress set forth in 18 U.S.C. § 3553(a)(2).

Respectfully submitted,

Northern District of Indiana
Federal Community Defenders, Inc.

By:    <u>s/John E. Martin</u>
       John E. Martin
       31 East Sibley Street
       Hammond, IN 46320
       Phone: (219) 937-8020
       Fax:  (219) 937-8021

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 3, 2008, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which sent notification of such filing to the following:

**Philip Craig Benson**
philip.benson@usdoj.gov

and I hereby certify that I have mailed the document by U.S. Postal Service to the following non

CM/ECF participants: NONE

 s/ John E. Martin